IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DARICK EASTERLING          :          CIVIL ACTION
                           :
        v.                 :
                           :
COUNTY OF DELAWARE         :          NO. 23-5016

MEMORANDUM

Bartle, J.                                    May 21, 2025

This is an employment discrimination action brought by plaintiff Darick Easterling under the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"), and the Pennsylvania Human Relations Act, 43 Pa. Stat. § 951, et seq. ("PHRA"), against his former employer, the County of Delaware.[1] On February 28, 2025, a jury found after a three-day trial that the County wrongfully discriminated against Easterling on the basis of his disability and failed to accommodate his disability.  The jury also found that Easterling failed to prove his claim of retaliation in violation of the ADA and the PHRA.[2]

_____

1.   Plaintiff also brought claims under the Family & Medical Leave Act, 29 U.S.C. § 2601, et seq. ("FMLA").  The court granted summary judgment in favor of Delaware County on these claims.  See Memorandum (E.D. Pa. Feb. 13, 2025) (Doc. # 45); see also Memorandum (E.D. Pa. Feb. 26, 2025) (Doc. # 62).

2.   Although the state law claim was not mentioned to the jury, the parties stipulated that the jury's determination as to plaintiff's federal law claim would also control as to his PHRA claim because the two statutes are coextensive, at least for the purposes of liability.  See Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).

It awarded Easterling $1 in compensatory damages, that is
damages for any pain or suffering he experienced as a
consequence of Delaware County's unlawful conduct.  Thereafter,
the court held a non-jury trial on damages and added $92,690.30
in back pay, prejudgment interest of $4,538.12, and $105,347.96
in front pay in lieu of reinstatement.  Together with the $1
awarded by the jury, the court entered a judgment in favor of
Easterling in the amount of $202,577.38 (Doc. # 75).

       Before the court is the motion of Delaware County for
judgment as a matter of law under Rule 50(b) of the Federal
Rules of Civil Procedure or in the alternative, for a new trial
under Rule 59 (Doc. # 81).  Delaware County argues that the
evidence was insufficient for a jury to find that plaintiff was
able to perform an essential function of his job as a
correctional officer.

I

       A defendant is entitled to relief under Rule 50(b) of
the Federal Rules of Civil Procedure only if plaintiff "has been
fully heard on an issue and there is no legally sufficient
evidentiary basis for a reasonable jury to find for [the
plaintiff] on that issue."  See Reeves v. Sanderson Plumbing
Prods., Inc., 530 U.S. 133, 149 (2000) (quoting Fed. R. Civ. P.
50(a)).  This form of relief is "granted sparingly" and reserved
only for those cases "where 'the record is critically deficient

-2-

of the minimum quantum of evidence' in support of the verdict."
See Eshelman v. Agere Sys., Inc., 554 F.3d 426, 433 (3d Cir.
2009) (quoting Gomez v. Allegheny Health Servs., Inc., 71 F.3d
1079, 1083 (3d Cir. 1995)).  "The question is not whether there
is literally no evidence supporting the unsuccessful party, but
whether there is evidence upon which a reasonable jury could
properly have found its verdict."  Id. (quoting Gomez, 71 F.3d
at 1083).

        The court should review all of the evidence in the
record and draw all reasonable inferences in favor of the
nonmoving party without making credibility determinations or
weighing the evidence.  Reeves, 530 U.S. at 150-51.  In this
process, the court must "disregard all evidence favorable to the
moving party that the jury is not required to believe."  Id. at
151.  It goes without saying that "[c]redibility determinations,
the weighing of the evidence, and the drawing of legitimate
inferences from the facts are jury functions, not those of a
judge."  Id. at 150-51 (quoting Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 255 (1986)).

        In the alternative, Delaware County seeks a new trial
under Rule 59.  It provides that "[t]he court may, on motion,
grant a new trial . . . after a jury trial, for any reason for
which a new trial has heretofore been granted in an action at
law in federal court."  See Fed. R. Civ. P. 59(a)(1)(A).  Our

-3-

Court of Appeals has "cautioned that a district court should grant a new trial on the basis that the verdict was contrary to the weight of the evidence 'only where a miscarriage of justice would result if the verdict were to stand.'" Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1076 (3d Cir. 1996) (quoting Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1352 (3d Cir. 1991)).  For example, a miscarriage of justice may occur due to "[i]nappropriately admitted evidence, improper jury instructions, [or] a verdict against the weight of the evidence."  Repa v. Napierkowski, No. 22-2537, 2023 WL 3034603, at *1 (3d Cir. Apr. 21, 2023) (citing Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940)).  Unlike a motion pursuant to Rule 50, the court is not required to view the evidence in the light most favorable to the verdict winner.  See Valentin v. Crozer-Chester Med. Ctr., 986 F. Supp. 292, 298 (E.D. Pa. 1997) (citing Magee v. Gen. Motors Corp., 213 F.2d 899, 900 (3d Cir. 1954)).

II

The facts in the light most favorable to plaintiff as the verdict winner are as follows.  Easterling worked as a correctional officer at the George W. Hill Correctional Facility, also known as the Delaware County prison, for almost twenty years.  He served as a mentor for other correctional officers and was never disciplined.

-4-

During the twenty years Easterling was a correctional officer at the prison, multiple private companies managed the facility.  On April 6, 2022, Delaware County assumed management of the prison from GEO Group.  The County terminated Easterling on May 5, 2022 because he was unable due to his spinal stenosis to work sixteen hours consecutively--a regular eight-hour shift and an eight-hour overtime shift.

When GEO Group operated the prison, it permitted employees to find substitutes to work all or part of their overtime shifts.  When GEO Group mandated an officer to work overtime, the officer was permitted to split their shift, that is to ask up to two additional employees to work at least a portion of the officer's eight-hour overtime shift.  That way, the mandated employee would not need to work a full sixteen hours consecutively.  If the substitute failed to appear for the hours the substitute offered to cover, the mandated employee would still be required to work those hours or find a different substitute.  Major Albert Pleasant, a correctional officer at the Delaware County prison for thirty-six years, testified that the split shift system was "difficult" and "chaotic" because of the additional paperwork that the shift commander had to complete as well as difficulty maintaining supervision at each post throughout the whole shift.  Nonetheless, he successfully completed this paperwork as a shift commander with GEO Group

when the split-shift system was in effect.  Easterling testified
that GEO Group rarely required officers to work mandatory
overtime because other officers regularly volunteered to take
their place.

When GEO managed the prison, the times of three shifts
were not the same for all correctional officers.  Officers
responsible for visitation and some who worked in transport
roles worked different hours than correctional officers
responsible for general supervision.  Nevertheless, all officers
were eligible to be mandated to work overtime absent an
accommodation.

After Easterling was diagnosed with spinal stenosis in
2016, his doctor ordered that he could only work eight hours at
a stretch.  GEO Group accommodated him and required Easterling
to work only a single eight-hour shift.[3]  He had no obligation to
work overtime shifts.

In March 2022, in anticipation of its takeover of the
prison, Delaware County hired George Rhoades as an investigator.
His role was to interview individuals, including those who had

---

3.    At the time of his diagnosis, he took medication to treat
pain resulting from his spinal stenosis three times a day, that
is once every eight hours.  At some point after his diagnosis
and before Delaware County assumed management of the prison, he
began to take his medication only twice a day.  Since he now
only takes his medication once every twelve hours, he can work
twelve hours consecutively.

worked for GEO, for the position of correctional officer at the prison.  He interviewed Easterling on March 14, 2022.  He asked Easterling, as well as other applicants, a series of written questions prepared by Laura Williams, the new warden appointed by Delaware County.  Question three stated, "If hired, do you understand that an essential function is to work mandated overtime, to ensure safe shift coverage, and that you may be mandated to work additional overtime?"  Rhoades wrote down that Easterling responded "yes."  At the conclusion of his interview, Rhoades recommended that Delaware County hire Easterling.

Delaware County offered Easterling a position that same day.  He accepted the offer four days later on March 18, 2022.  The offer letter he received stated that "Essential Job Duties include, but may not be limited to: Mandated Overtime." The letter does not identify the number of hours or the frequency of the mandated overtime.  While Easterling was aware that Delaware County would require officers to work mandatory overtime, he and another correctional officer testified that they were not aware that the prison would require that officers work sixteen hours consecutively or that obtaining a substitute would no longer be permitted.  There is no evidence in the record that the County advised Easterling before he accepted the position that the mandated overtime requirements meant sixteen hours of work at a stretch.

On April 6, 2022, the day that Delaware County assumed management of the prison, Warden Williams made an announcement during roll call that mandatory overtime would consist of a full eight-hour overtime shift to be served immediately following an officer's regular eight-hour shift.  In addition, officers would no longer be permitted to seek substitutes for a portion of their mandated overtime as occurred under GEO Group's management.  Officers were still permitted to find a substitute if the substitute was willing to work the full overtime shift. She eliminated any deviation from the three, eight-hour regular shifts to begin and end at the same time for all officers. After Delaware County assumed management of the prison, any officers assigned to staff the prison's visitation area began working on the first and second shifts.  Officers assigned to transport inmates outside the prison also began working within these standardized shift times.  These officers were required to work mandatory overtime on the same schedule as officers responsible for general supervision.

Warden Williams prepared a job description for the County's correctional officers.  It states that a required skill is an "Ability to work up to sixteen (16) hours in a rolling 24-hour period."  The only date of this document in the record is April 13, 2022, the date it was received by Human Resources. This is seven days after Easterling began his job with the

-8-

County.  Williams testified that it was "published well in advance of the transition and well before" any prospective correctional officers were interviewed.  Nonetheless, Easterling testified he did not see this job description until after he began working for Delaware County.  There was no evidence in the record as to any employee handbook or collective bargaining agreement or, if they existed, whether they contained any reference to mandated overtime.

On April 4, 2022, Easterling's doctor, Andrea Young, had written a note addressed to "Sir/Madam" which requested that Easterling be excused "from: working more than 12 hours each shift.  [He] can work up to 12 hours each shift full duty." Easterling brought this letter, along with an "ADA Reasonable Accommodation Form," dated April 6, 2022, which further described his accommodation request, medical condition, and treating physician, to the County.  He timely provided this paperwork to the County as well as further documentation it requested.  He met twice with Angela Frattarelli, the advisor-manager of Employee Relations & Leave of Absence with the County's human resources department, to discuss his request for a reasonable accommodation on the basis of his disability. There was no evidence before the jury that she discussed alternative positions for which Easterling would have been eligible, although Frattarelli testified that it is her general

practice to offer "assistance in the application process" for a substitute role with Delaware County.

While Delaware County considered whether it was possible to accommodate Easterling, he worked on two occasions a full eight-hour overtime shift after his eight-hour regular shift against his doctor's orders. After his first sixteen hours of work, he was in a lot of pain. After his second full overtime shift, he went to urgent care because his pain was so bad. On April 22, he was again mandated to work overtime. Rather than working the full sixteen hours, he attempted to provide the lieutenant in charge with his doctor's note. After she refused to look at his paperwork, Easterling informed the lieutenant that he would only work four hours of his full eight-hour mandated overtime shift and left after doing so. As a result, he was suspended for one day. Warden Williams testified that this was the first step penalty of the County's progressive disciplinary matrix for a refusal of mandatory overtime, while Easterling testified that he understood it to be a later step.

At trial, Warden Williams stated that at the time of the transition, the prison operated at almost fifty percent of their staffing capacity. She explained that

> COVID did a number on the nation or world in terms of the workforce in general, but certainly with congregate settings and jails.

-10-

. . . .

> And a lot of employees were getting really
> burnt out working in the congregate setting.
> At the beginning of the pandemic, nobody
> really knew what to expect.  There was a lot
> of fear.  There was a lot of frustration.
> There was illness.  So many correctional
> agencies that might have already been
> challenged with staffing, that was not
> exclusive to the GEO Group.  That was
> something that was very common in every
> single agency, whether that was county,
> state, or federal level.

In her view, these shortages, in conjunction with the

unpredictable nature of managing a prison, make mandatory

overtime necessary.  Extra security may be needed on short

notice when incarcerated persons are on a "suicide precaution,"

which requires one-on-one continuous supervision.  The need for

correctional officers also increases when a prisoner has a

medical emergency because two additional officers must be

available to transport the prisoner offsite to the hospital.  To

Warden Williams, mandatory overtime is the norm in the industry.

Shortly after the management transition on April 6,

2022, each shift had correctional officers working mandated

overtime each day on a regular basis.  Warden Williams believed

that it would not be "sustainable" for an employee to secure a

substitute for each overtime shift for which an officer was

mandated and that she had not seen "anybody capable of doing

that" for an extended period of time.

-11-

Warden Williams also testified that due to the need for continuous coverage it was not possible to mandate employees to work less than a full eight-hour overtime shift.  When an officer leaves midway through his or her shift, that post is left vacant for the remainder of the shift and compromises the prison's safety.

Warden Williams was responsible for terminating Easterling.  Although officers were still permitted to find substitutes for their mandated overtime shifts, she testified that he would be unable to find a volunteer each time.  In her view, his failure to do so would compromise the safety of the institution.  Since he was unable to work sixteen hours consecutively and because it would not be possible for the prison to accommodate him, Warden Williams decided to terminate him.

### III

Delaware County made a Rule 50(b) motion during the trial, which the court denied.  The County has now renewed its motion.  It does so solely on the ground that there was insufficient evidence for the jury to find that eight hours of mandated overtime after a regular eight-hour shift was not an essential function of Easterling's job as a Delaware County correctional officer.

To establish discrimination under the ADA, a plaintiff must prove that: (1) he or she is disabled within the meaning of the ADA; (2) he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation by the employer; and (3) he or she suffered an adverse employment action as a result of the discrimination. Gaul v. Lucent Techs. Inc., 134 F.3d 576, 580 (3d Cir. 1998).

An employee is a "qualified individual" when he or she,

> with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of [the ADA], consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8). The court instructed the jury as to what is meant by and should consider in deciding what are the essential functions of Easterling's job as a correctional officer. The court charged without objection what is in essence a portion of Section 9.2.2 of the Third Circuit's Model Civil Jury Instructions:

> In determining whether Mr. Easterling could perform the essential functions of a correctional officer at the Delaware County Prison, you should keep in mind that not all

-13-

job functions are essential.  Essential
functions are a job's fundamental duties.

In deciding whether working 16 hours in a row
is essential to the job of a correctional
officer at the Delaware County prison, some
factors you may consider include the
following:

A)    Whether working sixteen hours in a row is
      the reason that the Correctional Officer
      position exists;
B)    Whether there are a limited number of
      employees available to work 16 hours in a
      row.
C)    Whether working 16 hours in a row is
      highly specialized so that the person in
      the position is hired for his or her
      expertise or ability to perform the
      particular function.
D)    Delaware County's judgment about which
      functions are essential to the job of a
      correctional officer.
E)    Written job descriptions prepared for the
      correctional officer position.
F)    The consequences of not requiring Mr.
      Easterling to work 16 hours in a row.
G)    The terms of any employee handbook.
H)    The terms of any collective bargaining
      agreement.
I)    Whether others who held the position of
      correctional officer were required to
      work 16 hours in a row.
J)    Whether those holding similar jobs also
      worked 16 hours in a row; and
K)    Whether certain certifications are
      necessary for assignments that may have a
      different overtime requirement.

No one factor is necessarily controlling. You
should consider all the evidence in deciding
whether an employee's ability to work 16
hours in a row, when mandated, is essential
to the job of a correctional officer at the
Delaware County prison.

Easterling had almost twenty years of experience as a correctional officer at the Delaware County prison. During his tenure, he was responsible for training multiple officers and had never been disciplined. He was a model employee. Albert Johnson, a correctional officer Easterling trained, testified that he "got part of [his] demeanor" as a correctional officer from observing Easterling. He was able to work four hours of overtime whenever mandated but was never told before he accepted the job that he would be mandated to work a full sixteen hours straight. He had not been forewarned that working such hours was an essential function of the job. There was no employee handbook or collective bargaining agreement in the record which referenced any required overtime.

Easterling's disability had been accommodated by GEO Group, his previous employer, when it managed the Delaware County prison. Furthermore, GEO Group had allowed officers to serve as partial substitutes to work any necessary overtime on a volunteer basis. While it may have resulted in extra paperwork, the system functioned. GEO Group had also allowed substitutes for the full mandated eight-hour overtime shift. The County presented no evidence that such a system would not result in sufficient volunteers.

There was also evidence that multiple correctional officers, such as visitation and transport correctional

-15-

officers, did not work standard shifts while GEO managed the prison and therefore, any overtime for which they were mandated did not follow the strict eight-hour framework. For transport officers, this lack of standardization persisted through Delaware County's management until on or about November 2024.

In support of its position that working sixteen hours consecutively is an essential function of the position, Delaware County relied primarily on evidence that there is a shortage of correctional officers and that mandatory overtime is necessary to meet the safety and security needs of the prison. The County cites evidence that at least as of April 6, 2022, the correctional officers were told they would be mandated to work sixteen hours in a row on a regular basis.

As the court charged, a jury must consider a wide range of job characteristics in order to conclude whether a job function is essential and no one factor is controlling. Our Court of Appeals has emphasized that such determinations must be made on a case-by-case basis and has overturned determinations by the district court on summary judgment that a job's function is essential. See Turner v. Hershey Chocolate U.S., 440 F.3d 604, 613 (3d Cir. 2006); see also Deane v. Pocono Med. Ctr., 142 F.3d 138, 148 (3d Cir. 1998) (en banc).

In Deane, our Court of Appeals reversed the grant of summary judgment on the issue of whether heavy lifting is an

-16-

essential function of the job of a nurse.  The Court reasoned
that defendant's undisputed job description and its own judgment
were merely two "<u>possible</u> types of evidence" in its favor and
that a genuine issue of material fact still existed on the
issue.  <u>Id.</u> at 148 (citing 29 C.F.R. § 1630.2(n)(3)).

        In <u>Turner</u>, our Court of Appeals overturned the
district court's grant of summary judgment on the ground that
there was a dispute of material fact as to whether a job
responsibility was essential.  In that action, plaintiff was
employed in production as a shaker table inspector.  After
becoming disabled in 1999, Hershey assigned her to work only on
one production line of the three available.  <u>Turner</u>, 440 F.3d at
606.  In 2001, Hershey instituted a rotational policy which
required employees to rotate among the three production lines
over the course of each shift.  <u>Id.</u> at 607.  Plaintiff refused
to rotate due to her medical issue.  Hershey then terminated
her.  The Court of Appeals concluded "several specific facts,
when juxtaposed against [the factors set forth in 29 C.F.R.
§ 1630.2(n)(3)], weigh against a finding that rotation itself is
an essential function of the shaker line position" and
therefore, the trial court should not have granted summary
judgment on this issue.  <u>Id.</u> at 612-13.  Specifically, the job
description did not reference rotation, employees spent minimal
time rotating, the collective bargaining agreement did not

reference rotation, and in the past, operators had not rotated.
Id.

The jury was correctly instructed on the various
factors to consider in determining whether eight hours of
mandatory overtime following a regular eight-hour shift was an
essential function of the job of a correctional officer at the
Delaware County prison.  Our Court of Appeals has explained that
no one factor is controlling and that the determination must be
made on a case-by-case basis.  Deane, 142 F.3d at 148.  It was
reasonable for the jury to find that working sixteen hours at a
stretch is not an essential function of Easterling's job and
that there were other ways to solve any employee shortage
besides mandating that Easterling, a model employee, work such
extended hours.  The jury, it must be emphasized, was not bound
to accept any evidence of the County to the contrary.  See
Reeves, 530 U.S. at 150-51.[4]

Accordingly, the motion of Delaware County for
judgment as a matter of law will be denied.

---

4.    In support of its argument, Delaware County also cites
Smith v. Burlington County of New Jersey, Civ. A. No. 02-5581,
2004 WL 1932850 (D.N.J. July 27, 2004).  While that action also
concerns whether overtime is an essential function of a
correctional officer's job, the defendant there provided
evidence of the prison's standard operating policies and the
officers' collective bargaining agreement, both of which
contemplated mandatory overtime.  Such evidence was absent here
and at least for this reason, Smith is distinguishable.

IV

      In the alternative, Delaware County moves for a new trial under Rule 59.  It advances the same argument that it was a miscarriage of justice for the jury to conclude that working sixteen hours in a row was not an essential function of the correctional officer position.

      While the court is not required to take evidence in the light most favorable to plaintiff, the jury's determination that mandatory overtime was not an essential function of the position was not a miscarriage of justice.  The court will deny the motion of Delaware County for a new trial.